UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUSTIN MUNIZ, MOHAMMED BELAABD, NELSON QUINTANILLA, JOSE DILONE, and VICTOR AMARO, on behalf of themselves and all others similarly situated,<br><br>        **Plaintiffs,**<br><br>        v.<br><br>XPO LAST MILE, INC.,<br><br>        **Defendant.** | CIVIL ACTION<br>NO. 4:18-11905-TSH |

## ORDER AND MEMORANDUM ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION (Docket No. 113)

**August 31, 2022**

**HILLMAN, D.J.**

Plaintiffs Justin Muniz, Mohammed Belaabd, Nelson Quintanilla, Jose Dilone, and Victor Amora bring this action, on behalf of themselves and all others similarly situated, against defendant XPO Last Mile, Inc. ("XPO"). The plaintiffs are delivery drivers who contracted with XPO, a federally authorized freight forwarder, to deliver appliances and other large consumers goods for XPO's retail clients. The plaintiffs allege that XPO misclassified them as independent contractors and unlawfully deducted wages from their pay in violation of the Massachusetts Wage Act, M. G. L. c. 149, §§ 148 and 150. The plaintiffs move to certify a class of drivers who, personally or on behalf of their business entity, signed a contract with XPO and personally performed deliveries for XPO full-time in Massachusetts from July 2015 to the present. (Docket No. 113). Courts in this district, including this Court, have granted similar motions for class

certification.  *See DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 394 (D. Mass. 2017); *Vargas v. Spirit Delivery & Distribution Servs., Inc.*, 245 F. Supp. 3d 268, 290 (D. Mass. 2017); *Martins v. 3PD Inc.*, 2014 WL 1271761, at *11 (D. Mass. Mar. 27, 2014).  Following those cases, and for the reasons articulated below, the Court ***grants*** the plaintiffs' motion.

## Background

XPO works with retailers on "last mile delivery" of appliances and other large consumer goods.  Typically, when a customer of one of XPO's retail clients makes a purchase and requests in-home delivery, the retail client sends the customer's order information to XPO.  XPO then uploads the order information to XPO's proprietary software and organizes disparate orders into efficient delivery sequences and routes.  For some retail clients, XPO aggregates retail goods at a centralized location before delivery.  For other retail clients, XPO operates a dedicated warehouse or arranges deliveries out of the retail client's retail store.

To make deliveries, XPO contracts with motor carriers, whom XPO refers to as "Delivery Service Providers" or "DSPs."  Some DSPs consist of a single driver operating a single truck; other DSPs consist of a team of drivers operating a fleet of trucks.  XPO requires all DSPs to form entities before contracting.

The contractual relationship between XPO and DSPs is set forth in a "Delivery Service Agreement" or "DSA."  As far as the class certification record is concerned, each DSA is substantively the same.  The DSA grants DSPs discretion over how to deliver freight; it also gives DSPs permission to deliver goods for other companies.  The DSA further provides that it is not intended to create an employer/employee relationship for any purpose.

The day before a scheduled delivery, XPO generates a delivery manifest and assigns it to a DSP.  The DSP may reject the assignment.  If the DSP accepts, the next morning, the DSP goes

to the pick-up location and receives any updates from the retail client. XPO managers regularly hold morning meetings with DSPs at pick-up locations to gather or provide feedback and address any issues. Some retail clients provide checklists and instructions for deliveries. If any issues arise during the day, such as heavy traffic or a dissatisfied customer, the DSP may contact XPO for assistance.

XPO requires all DSPs to have their own trucks, DOT numbers, and insurance coverage. XPO requires each driver to complete a background check, a drug screen, and a motor vehicle check. XPO provides each driver with an identification badge. XPO maintains records or all approved drivers. XPO also requires that each driver be accompanied by a "helper" to assist the driver with physically loading and unloading larger deliveries. To ensure its retail clients are satisfied, XPO tracks the performance of DSPs by monitoring metrics such as completion rates and customer feedback. XPO sometimes but not always shares those metrics with DSPs. In certain circumstances, XPO may terminate a relationship with a DSP due to poor customer feedback.

XPO pays DSPs either on a per-stop basis or by a flat, daily rate. DSPs are responsible for paying their helpers and "secondary drivers," if they have any, who may drive the DSP's truck(s) but who do not themselves have a contract with XPO. If a driver or helper causes any property damage during a delivery, XPO may deduct the value of the damage from the DSP's pay. DSPs may deal with the deduction as they wish; they may, for example, absorb the cost, pass it on to a helper or secondary driver, or file an insurance claim.

The named plaintiffs made deliveries for XPO during the class period. Justin Muniz delivered Lowe's goods for XPO seven days per week from 2015 to 2017. He contracted with XPO through an entity he created in 2004 called S&I Delivery, LLC. He operated a single truck. Mohammed Belaabd delivered IKEA and Amazon goods for XPO five to seven days per week

from 2015 to 2019. He operated through an entity he created called Atlas Transportation. He operated a single truck, except for six months in 2018 when he operated two trucks. Nelson Quintanilla delivered IKEA goods for XPO five days per week starting in 2014. His wife signed a contract with XPO on behalf of an entity Quintanilla and his wife own called VN Transportation. Quintanilla operated a single truck. Jose Dilone delivered Lowe's goods for XPO seven days per week in 2017. Dilone contracted with XPO through an entity he created called Maxi Truck. Dilone operated a single truck. Victor Amaro delivered Lowe's goods for XPO five days per week from 2015 to 2019. He contracted with XPO through an entity he created called Skyrlee Express. Amaro operated a single truck, except for one month when he operated two tucks. At various points, each named plaintiff worked with helpers and/or secondary drivers. When customers complained of damage to goods or property, XPO made deductions to each named plaintiff's pay.

During the class period, XPO contracted with approximately 534 DSPs to make deliveries in Massachusetts. XPO's data suggest that 349 of the DSPs worked with secondary drivers, 127 of the DSPs used one secondary driver per week, and 83 of the DSPs used at least five secondary drivers per week. Moreover, 264 of the DSPs worked with more than one XPO client, and 426 of the DSPs made deliveries both inside and outside Massachusetts.

Muniz commenced this action in July 2018 in Massachusetts state court. After XPO removed the case to federal court, Muniz twice amended the complaint to add Belaabd, Quintanilla, Dilone, and Amora as additional named plaintiffs. Collectively, the plaintiffs allege that XPO misclassified them as independent contractors and unlawfully deprived them of wages to which they were entitled under M. G. L. c. 149, §§ 148 and 150. The plaintiffs now move for class certification, seeking to certify the following class:

>All individuals who personally or on behalf of their business entity, signed a Service Agreement with XPO and who personally performed deliveries for XPO full-time in Massachusetts between July 2015 and the present.

The plaintiffs define "full-time" as "personally making deliveries at least 80 percent of the days XPO assigns routes to the contractor for at least three months and who average performing deliveries for XPO at least four days per week during that time span." In effect, the proposed class excludes primary drivers who only occasionally made deliveries for XPO or recruited secondary drivers to work in their place.[1] XPO opposes class certification.

## Legal Standard

Federal Rule of Civil Procedure 23 governs class certification. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 346 (2011). Rule 23(a) requires that "(1) there be numerosity, (2) there be common questions of law or fact, (3) the class representative's claims be typical of the class, and (4) the representative's representation of the class be adequate." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008). Rule 23(b)(3) requires that common questions "predominate" over individual questions, and that a class action be a "superior" method of adjudicating the controversy. *See id.* Rule 23 also implicitly requires that putative class

---

[1] The plaintiffs' briefing variably notes that the proposed class does not include contractors who operated more than five trucks on any given day. It is not clear to the Court whether this is an implication of the class definition or is intended to be an additional limitation on the class definition. For example, the proposed class notice attached to the plaintiffs' motion does not mention the number of trucks a contractor operated. Because the plaintiffs have not formally included a limitation on the number of tucks operated in their proposed definition, and the number of trucks operated does not appear, on its face, to relate to whether a contractor made deliveries for XPO "full-time," the Court has not considered the number of trucks operated as an additional limitation on the class definition. Even if the plaintiffs intended to include the number of trucks operated as an additional limitation on the class definition, however, class certification is warranted. If the Court misunderstood the plaintiffs' proposed class definition, the plaintiffs may move for a modification of this order.

5

members be "ascertainable" with reference to objective criteria. *See In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015).

A plaintiff seeking class certification must "affirmatively demonstrate" by a preponderance of the evidence that the Rule 23 requirements are met. *See Wal-Mart Stores*, 564 U.S. at 350; *In re Nexium*, 777 F.3d at 27. A court must test the plaintiff's assertions with "rigorous analysis." *See General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). This may require consideration of the merits. *See Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013). In considering the merits, a court may "test disputed premises," *Tardiff v. Knox County*, 365 F.3d 1, 4 (1st Cir. 2004), and "formulate some prediction as to how specific issues will play out," *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000).

## Discussion

### 1. Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Numerosity is a "low threshold." *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009). "Classes of 40 or more have been found to be sufficiently numerous under Rule 23(a)(1)." *DeRosa v. Massachusetts Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 98 (D. Mass. 2010). Here, the plaintiffs represent that the proposed class includes approximately 350 drivers. The plaintiffs analyzed XPO data outlining, for each day during the class period, which DSPs made deliveries for XPO, and which driver operated which DSP's truck(s). Of the approximately 520 DSPs who contracted with XPO during the class period, the plaintiffs represent that XPO's data suggest that approximately 350 drivers meet their class definition. XPO does not dispute the plaintiffs' calculations; rather, XPO argues that the plaintiffs have not presented evidence demonstrating why joinder of the proposed class members would be difficult to accomplish. Given

the number of potential class members, however, the numerosity threshold plainly is met. *See Vargas*, 245 F. Supp. 3d at 286.

### 2. *Commonality*

Rule 23(a)(2) requires that there be questions of law or fact common to the class. To satisfy this requirement, a plaintiff must demonstrate that the proposed class's claims "depend upon a common contention," the resolution of which is "central to the validity" of each of the class's claims. *Wal-Mart*, 564 U.S. at 350; *see also Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13, 28-29 (1st Cir. 2019). The commonality requirement is a "low bar." *New Motor Vehicles*, 522 F.3d at 19.

The plaintiffs allege that XPO misclassified them as independent contractors and made unlawful deductions to their pay in violation of M. G. L. c. 149, §§ 148 and 150. The Massachusetts A-C test, *see* M. G. L. c. 149, § 148B, determines whether XPO misclassified plaintiffs as independent contractors, *see DaSilva*, 296 F. Supp. 3d at 400-04.[2] Under the Massachusetts A-C test, "an individual performing any service . . . shall be considered an employee" unless:

> [Prong A:] the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact, and
>
> [Prong C:] the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

---

[2] XPO's argument that the Massachusetts A-C test does not apply is unavailing. The case on which XPO relies, *Jinks v. Credico (USA) LLC*, 177 N.E.3d 509, 513 (Mass. 2021), concerned whether the Massachusetts A-C test applies to questions of "joint employment" under Massachusetts law. Given the proposed class definition here, there are no apparent questions of joint employment.

M. G. L. c. 149, § 148B.[3]  The plaintiffs, relying on several cases from this District and elsewhere, contend that the question of misclassification can be resolved by common evidence.  *See, e.g.*, *Alvarez v. XPO Logistics Cartage, LLC*, 2020 WL 6253322, at *4 (C. D. Cal. Sept. 16, 2020).

Under Prong A, XPO misclassified the plaintiffs as independent contractors unless the plaintiffs were free from control and direction in making deliveries for XPO both under their contracts with XPO and in fact.  *See* M. G. L. c. 149, § 148B(a)(1).  Each member of the proposed class contracted with XPO, and the record suggests that each proposed class member's contract was substantively the same.  The question whether the proposed class members were free from control and direction in making deliveries for XPO under the terms of their contracts with XPO, therefore, is susceptible to common proof.  *See DaSilva*, 296 F. Supp. 3d at 401 (citing *Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 321-22 (3d Cir. 2016)).

The question whether the proposed class members were free from control and direction in making deliveries for XPO in fact is likewise susceptible to common proof.  *See Ouadani v. Dynamex Operations East, LLC*, 405 F. Supp. 3d 149, 162 (D. Mass. 2019).  The plaintiffs' allegations, combined with the evidence in the record, suggest that XPO treated the proposed class members similarly, pursuant to standard policies and procedures.  For example, for all drivers in the proposes class, XPO assigned delivery routes with designated timeframes for each stop, required drivers to wear professional attire and carry identification badges, and monitored drivers' performance metrics, such as their completion rates and customer feedback.  Indeed, the fact that XPO required all drivers to abide by XPO's client's expectations -- even though those expectations varied from client to client -- is a fact common to the class and relevant to the issue of liability.

---

[3] Prong B of the test is preempted by federal law.  *See Schwann v. FedEx Ground Package Sys., Inc.*, 813 F. 3d 429, 442 (1st Cir. 2016).

Under Prong C, XPO misclassified the plaintiffs as independent contractors unless the plaintiffs were customarily engaged in an independently established trade or business. *See* M. G. L. c. 149, § 148B(a)(3). To determine whether a worker is engaged in an independently established trade or business, the operative question is whether "the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services." *Athol Daily News v. Bd. of Review of Div. of Emp't & Training*, 786 N.E.2d 365, 373 (Mass. 2003). Here, the answer to that question depends on evidence common to the proposed class. XPO's arguments to the contrary focus on the varying sizes of DSPs and the ability of DSPs to reject assignments and make deliveries for other companies. First, the proposed class consists of individuals who <u>personally</u> made delivers for XPO <u>full-time</u>. Analyzing whether those specific individuals could make deliveries for other companies or, conversely, were compelled to rely on XPO does not depend on the size of their operations. Second, the contention that DSPs could reject assignments and make deliveries for other companies does not appear to depend on any differences between the DSPs. Rather, the records suggests that the flexibility (to the extent it was real) applied across the board. Thus, even accepting XPO's framing, the commonality requirements is met.

### 3. Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. To satisfy this requirement, the representative plaintiffs' injuries must "arise out of the same events or course of conduct" as the injuries of the class, and the representative plaintiff's claims must be "based on the same legal theory" as the claims of the class. *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008). The typicality

9

requirement, which tends to merge with the commonality requirement, *see Wal-Mart*, 564 U.S. at 349 n.5, is "not highly demanding because the claims only need to share the same essential characteristics, and need not be identical." *Payne v. Goodyear Tire & Rubber Co.*, 2016 F.R.D. 21, 24-25 (D. Mass. 2003). Here, the plaintiffs and the proposed class all were classified as independent contractors, all signed contracts with XPO, and all made deliveries for XPO full-time (for at least a portion of the class period). Even if some DSPs handled deductions differently, all DSPs were subject to the same policy of deductions. Because the named plaintiffs' claims share the same essential characteristics as the proposed class's claims, the typicality requirement is met.

### 4. Adequacy

Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

XPO contends that the named plaintiffs are inadequate class representatives because they have little knowledge of class actions and of their potential roles as class representatives. Through their depositions, however, the named plaintiffs sufficiently demonstrated a basic understanding of their claims against XPO. *See Henderson v. Bank of N.Y. Mellon*, 322 F.R.D. 432, 435 (D. Mass. 2017). Moreover, plaintiffs' counsel, having represented classes in numerous similar cases, are more than qualified to represent the proposed class.

The named plaintiffs' interests align with the interests of the proposed class. That certain members of the proposed class may have handled deductions differently than the named plaintiffs does not render the named plaintiffs in conflict with proposed class. At bottom, the named plaintiffs and the proposed class are seeking to vindicate the same rights based on the same asserted misclassification and practice of unlawful deductions.

Finally, however, as XPO argues, Quintanilla cannot serve as a class representative because he is not in the proposed class. *See Amchem*, 521 U.S. at 625-26. The proposed class consists of individuals who "personally or on behalf of their business entity" signed a contract with XPO. Quintanilla did not personally or on behalf of his business entity sign a contract with XPO; his wife did. For all but Quintanilla, the adequacy requirement is met.

### 5. *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. The inquiry requires "careful scrutiny to the relation between common and individual questions" in the case. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). While the inquiry has overlap with questions of commonality and typicality, it is "far more demanding." *New Motor Vehicles*, 522 F.3d at 20 (quoting *Amchem*, 521 U.S. at 624). The "aim" of the inquiry is to "test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'" *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) (quoting *Amgen*, 568 U.S. at 469).

"In deciding whether individual issues predominate over common questions, a court must not rely on mere speculation that individual issues may arise." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89 (1st Cir. 2021). Rather, a court must consider "'the probable course of

litigation' so as to 'formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate.'" *Id.* (quoting *Mowbray*, 208 F.3d at 298). Rule 23(b)(3) does not require a plaintiff to prove that each element of the claim is susceptible to class-wide proof. *Amgen*, 586 U.S. at 469. "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important maters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 577 U.S. at 453 (quotations omitted).

XPO argues that individual issues will predominate because determining whether each class member was misclassified as an independent contractor will require examination of each class member's operation and distinct relationship with XPO. To the contrary, the misclassification question largely will turn on XPO's practices and policies, which the record suggests applied uniformly to all class members. *See DaSilva*, 296 F. Supp. 3d at 406.

XPO also argues that individual issues will predominate because the record demonstrates no uniformity in how DSPs handled deductions. This argument is speculative. *See Bais Yaakov*, 12 F.4th at 89. True, DSPs can pass deductions onto others -- and they apparently do so with respect to secondary drivers, at least when those secondary drivers cause damage leading to deductions. *See Gonzalez v. XPO Last Mile, Inc.*, 2022 WL 95930, at *2 (D. Mass. Jan. 10, 2022). But here, the proposed class consists only of primary drivers who contracted with XPO and who allege damages from deductions related to their own personal, full-time work for XPO. XPO has offered no basis for concluding that primary drivers passed deductions relative to their own work onto others. In any event, Rule 23(b)(3) does not require each issue to be susceptible to resolution by common proof. *See Tyson Foods*, 577 U.S. at 453. Because individual issues will not

predominate over common questions, the predominance requirement is met. *See DaSilva*, 296 F. Supp. 3d at 406; *Vargas*, 245 F. Supp. 3d at 289.

### 6. Superiority

Rule 23(b)(3) also requires that class adjudication be superior to other available methods for adjudicating the controversy. Class adjudication is superior to dozens of individual cases covering the same issues. *See Espinal v. Bob's Discount Furniture, LLC*, 2020 WL 6055123, at *9 (D.N.J. Oct. 14, 2020). Given the circumstances of this case, class adjudication will be "far more efficient and economical." *Vargas*, 245 F. Supp. 3d at 289. Accordingly, the superiority requirement is met.

### 7. Ascertainability

Rule 23 implicitly requires that a putative class be ascertainable with reference to objective criteria. *See Romulus v. CVS Pharm., Inc.*, 321 F.R.D. 464, 467 (D. Mass. 2017). The proposed class consists of "all individuals who personally or on behalf of their business entity, signed a Service Agreement with XPO and who personally performed deliveries for XPO full-time in Massachusetts between July 2015 and the present." XPO contends that the proposed class definition is "incomplete" because it does not reference deductions, which XPO maintains were handled by putative class members in a variety of ways.

First, the proposed class definition renders the class readily ascertainable based on XPO's records, which track which DSPs and drivers made deliveries for XPO each day. *See DaSilva*, 296 F. Supp. 3d at 406-07. Second, even if DSPs handled deductions in a variety of ways, XPO does not appear to dispute that all DSPs were subject to deductions. The plaintiffs are not claiming damages from deductions attributable to others, *see Martins*, 2014 WL 1271761, at *13, and it is not clear, at least at this stage, that the way in which a DSP handled deductions attributable to their

own work is determinative of liability or damages. In any event, "the exact damages owed each driver is not an ascertainability issue." *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 481 (3d Cir. 2020). Thus, the proposed class is ascertainable.

## Conclusion

For the reasons stated, the Court ***grants*** the plaintiffs' motion for class certification. The Court certifies the following class:

> All individuals who personally or on behalf of their business entity, signed a Service Agreement with XPO and who personally performed deliveries for XPO full-time in Massachusetts between July 2015 and the present.

The term "full-time" means "personally making deliveries at least 80 percent of the days XPO assigns routes to the contractor for at least three months and who average performing deliveries for XPO at least four days a week during that time span."

The Court appoints Justin Muniz, Mohammed Belaabd, Jose Dilone, and Victor Amora as class representatives, and Lichten & Liss-Riordan, P.C. as class counsel.

Class counsel shall file a proposed class notice, consistent with this order, by September 9, 2022. If XPO objects to the proposed class notice, it shall file its own proposed class notice by September 16, 2022.

**SO ORDERED**

>                            */s/ Timothy S. Hillman*
>                            **TIMOTHY S. HILLMAN**
>                            **DISTRICT JUDGE**