UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUSTIN MUNIZ, MOHAMMED BELAABD, NELSON QUINTANILLA, JOSE DILONE, and VICTOR AMARO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RXO LAST MILE, INC.,<br><br>Defendant. | CIVIL ACTION<br>NO. 4:18-11905-TSH |

### ORDER AND MEMORANDUM ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Docket No. 161)

**August 21, 2023**

**HILLMAN, S.D.J.**

Plaintiffs Justin Muniz, Mohammed Belaabd, Jose Dilone, and Victor Amora bring this action on behalf of a certified class against defendant RXO Last Mile, Inc. ("RXO"). The plaintiffs are delivery drivers who contracted with RXO, a federally authorized freight forwarder, to deliver appliances and other large consumers goods for RXO's retail clients. The plaintiffs allege that RXO misclassified them as independent contractors and unlawfully deducted wages from their pay in violation of the Massachusetts Wage Act. M.G.L. c. 149, §§ 148 and 150. The plaintiffs move for partial summary judgment on the issue of whether they were misclassified as independent contractors under the test laid out in Section 148B ("148B"). (Docket No. 161). For the reasons below, the Court ***grants*** plaintiffs' motion.

1

**Background**

RXO contracts with large retailers to deliver furniture and appliances to customers' homes. To conduct these deliveries, RXO contracts with drivers who it classifies as independent contractors. Four individuals[1] represent a class of drivers who signed Delivery Service Agreements ("DSAs") with RXO, worked full-time, and operated less than five trucks a week. The discussion of the relevant facts will occur below due to the fact-intensive nature of the inquiry under 148B and because RXO disputed almost every single fact that plaintiffs put forward in their statement of material facts.

For the sake of consistency this Court will refer to the defendant as "RXO" throughout the order even when describing events that occurred while it was doing business as "XPO." The Court will refer to the entities that RXO contracts with as "Delivery Service Providers" ("DSPs"), but will refer to "drivers" and "helpers" when referring to instances that apply only to the individuals actually driving the trucks or helping with deliveries.

**Standard of Review**

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit. *Id*. When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

---

[1] This Court previously found that Nelson Quintanilla does not qualify for the certified class. (Docket No. 147, at 11).

Normally, at summary judgment "[t]he judge's inquiry . . . unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the *plaintiff* is entitled to a verdict—whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (citations omitted) (emphasis added). However, 148B creates a presumption that, if "an individual perform[s] any service" they are the employee of the person they are performing that service for. *Patel v. 7-Eleven, Inc.*, 489 Mass. 356, 360, 183 N.E.3d 398, 404 (2022). The defendant does not contest that the threshold of providing services is met. Because the plaintiffs are moving for summary judgment and the defendant bears the burden of proof, the Court will proceed as it would in a civil case where the defendant moved for summary judgment and the plaintiff bore the burden of proof. However, here it is the defendant who "may not rest upon [] mere allegations or denials . . . but must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (emphasis added) (citations omitted).

To create a genuine dispute, the non-moving party must present "significant probative evidence." *Id.* at 249. Conclusory statements that would be acceptable at the pleading stage are not sufficient to defeat summary judgment. *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 85 n. 13 (1st Cir. 2022) (describing summary judgment as the "put up or shut up moment in litigation") (citation omitted). Although credibility determinations are barred, Courts may not "draw unreasonable inferences or credit bald assertions." *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 66-67 (1st Cir. 2017) (citation omitted).

## Analysis

1. Which Facts are Properly Disputed

   a. The Scope of Proper Disputes

3

Before making findings of fact, this Court must address RXO's obstructive responses to plaintiffs' statement of material facts. For instance, RXO repeatedly disputes that it "required" anything, insisting instead that it simply would not do business with entities that did not meet its conditions. Similarly, RXO repeatedly disputes that it interacted with "drivers," insisting that it only interacts with DSPs. Given the class in question, these are distinctions without a difference and do not create disputes. RXO also "disputes" facts by raising issues that are not pertinent to the fact asserted. These representations are disingenuous, and the Court does not consider facts disputed on those grounds. Finally, RXO repeatedly restates legal standards to manufacture a dispute. *See, e.g.*, (Docket No. 175-C, at ¶ 43) ("[RXO] did not involve itself in any DSP's day-to-day operations or personnel decisions.") Such representations cannot create a factual dispute, any more than a corporate officer testifying that his company was "not negligent" could, without further details.

Furthermore, RXO cannot escape liability by arguing that its clients, or the industry, or safety concerns, or concern for customer satisfaction prompted its policies. "If the nature of a business requires a company to exert control over workers . . . then that company must hire employees, not independent contractors." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1316 (11th Cir. 2013); *see also Somers v. Converged Access, Inc.*, 454 Mass. 582, 590-93, 911 N.E.2d 739, 748-50 (2009) (148B is a strict liability statute and does not turn on the employer's intention or even knowledge). The Supreme Judicial Court has been clear that 148B is to be interpreted and applied liberally, *Patel*, 489 Mass. At 359-60, 183 N.E. 3d at 403-04, and limitations on its scope should not be implied, *id.* at 363, 406. The Court does not consider a fact irrelevant merely because of the mental state that prompted it. That said, if workers are required by law to conduct business in a certain manner, that cannot be used as evidence against an

4

employer. *Tiger Home Inspection, Inc. v. Dir. Of the Dep't of Unemployment Assistance*, 101 Mass. App. Ct. 373, 379-80, 193 N.E. 3d 462, 468 (2022); *see also Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 333, 28 N.E.3d 1139, 1150 (2015) (rules regarding a taxi "driver's appearance, cellular telephone usage, ability to smoke, procedures for obtaining or refusing passengers," etc., are established by law, not by employers).

RXO also raises hearsay objections to contracts between RXO and third-party clients. While contracts between two non-parties might present a hearsay issue, *see, e.g.*, *United States v. Potter*, 463 F.3d 9, 21 (1st Cir. 2006), a contract between a party and a non-party that affects the legal rights of both parties in the litigation is admissible, *see, e.g.*, *Florence Nightingale Nursing Servs., Inc. v. Paul Revere Life Ins. Co.*, 60 F.3d 809, at *4 (1st Cir. 1995) (unpublished); *Heal v. Wells Fargo, N.A. as Tr. For WaMu Mortg. Pass-Through Certificates Servs. 2006-PR2 Tr.*, 560 F. Supp. 3d 347, 356–57 (D. Mass. 2021), *aff'd*, 2023 WL 1872583 (1st Cir. Jan. 17, 2023). Here, where the DSA required the DSP to act to the satisfaction of RXO, the DSPs legal rights are implicated by obligations RXO has to its clients—for example, to not contract with non-compliant DSPs. And, as discussed below, there is undisputed evidence that RXO enforced clients' expectations against DSPs. This Court will consider these contracts.

In addition to hearsay arguments, RXO introduces evidence that the contract may not accurately describe the actual business relationship between RXO and the client. (Docket No. 175-A, at ¶ 13)**.** However, RXO introduces no evidence of the actual relationship between itself or any of its clients. "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists. Neither wishful thinking nor mere promise[s] to produce admissible evidence at trial, nor conclusory responses unsupported by evidence" are sufficient to

defeat summary judgment. *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). Therefore, this Court finds that the contracts are relevant and not properly disputed.

In many of the disputes, RXO does not dispute a fact in its entirely, but its extent—or it disputes the fact entirely, but only introduces evidence as to the extent. That does not necessarily create a trial-worthy dispute. For instance, defendant disputes plaintiffs' assertion that there was a uniform requirement by putting forward evidence of a dress code. Therefore, this Court finds it undisputed that there was a dress code and considers that in its 148B analysis.

Finally, this Court only reviews disputes over material facts and does not engage in disputes over non-material facts. Due to the defendant's obstructive response the Court will not review every factual dispute between the parties. Instead, the Court will note a few representative examples of disputes before making findings of fact.

Plaintiffs aver that RXO's clients provided requirements and instructions to DSPs. (Docket No. 163, at ¶ 60). These included requirements relating to appearance, including uniform requirements, delivery and installation of equipment, and contacting customers. (Docket No. 163, at ¶¶ 70-74). And, RXO's client-contracts required specific on-time delivery rates, delivery availability, type and appearance of trucks, manner of delivery, and required them to terminate DSPs that did not meet the client's expectations. (Docket No. 163, at ¶¶ 75-79, 81). There is a genuine dispute as to the appearance of trucks and uniforms, but RXO's other objections are meritless. RXO introduces testimony that all client expectations were advisory, unenforced, and therefore not material. (Docket No. 175-C, at ¶¶ 12-13). This is inconsistent with other testimony by the same individual, *see, e.g.*, (*Id.* at ¶ 15); (Docket No. 175-A, at ¶ 19); (*Id.* at ¶ 67), as well as copious evidence in the record. Although this Court must make all reasonable inferences in favor of the defendant, it need not accept "bald assertions" that make no

attempt to dispute specific, contrary evidence in the record, especially when the individual in question is making contradictory assertions. Furthermore, RXO offers no evidence that DSPs were aware that the direction given by clients was merely "advisory." And it is undisputed that RXO would move DSPs to a different client if they did not meet the original client's expectations. Charitably construed, RXO does not consider that "enforcing" expectations. This Court disagrees. Therefore, there is no genuine dispute that the clients' expectations were enforced.

The defendant's objection to plaintiffs' contention that "co-loading" products was not allowed is similarly misplaced. (Docket No. 163, at ¶ 82). RXO introduces evidence that DSPs were not subject to a non-compete agreement and were not barred from carrying other cargo after their route was finished. That evidence is extraneous to the question of whether, *during their deliveries*, DSPs could carry non-client freight. RXO also puts forward deposition testimony that reads: "Clients would not prefer [co-loading], but there have been instances where as long as it doesn't interfere with the dedicated client's performance and expectations on the execution of the route that day, they would prefer that does not happen." (Docket No. 175-M, at 84). Although this Court must make all reasonable inferences in favor of the non-moving party, the testimony is ambiguous nearly to the point of incoherence. Read charitably, the declaration establishes that there may have been instances where the co-loading prohibition was flouted. But it does not speak to RXO's response and is undisputed that RXO's clients objected to co-loading and that RXO generally enforced clients' expectations. Therefore, there is no genuine dispute that co-loading was prohibited.

b. *Findings of Fact*

It is the practice of RXO's mangers to meet with a DSP before signing a DSA, where managers provide the prospective DSP with a list—which may be verbal or written—of requirements they must fulfill to make deliveries for RXO. RXO also provides prospective DSPs with a "Pre-Qualification Packet" that lists pre-work requirements, including drug testing and getting a photo taken for an RXO ID badge. RXO requires all DSPs to sign identical DSAs.

RXO requires specific kinds and amounts of insurance, including workers compensation insurance,[2] and to list RXO and its affiliates and customers as insureds, and requires background checks for drivers and helpers. RXO requires DSPs to "provide services in a manner consistent with white glove industry standards" and their relationship is at will for either party with fifteen days' notice or "for failure to perform deliveries up to [RXO] standards." DSPs are expected to be available for deliveries seven days a week. The consequences of turning down a delivery are disputed.

DSPs are required to have a box truck, but the level of control over appearance is disputed. DSPs own and maintain their vehicles, may park them wherever they choose, supply their own tools, and hire, train, and pay their helpers and drivers. All drivers and helpers are required to have an RXO ID badge with an associated identification number. DSPs are paid a set amount per delivery and rates are negotiated between RXO and the client, not RXO and the DSP. There are situations where high-performing DSPs may negotiate a flat rate or higher "settlement" prices[3] for routes too sparse to be profitable under the standard per-delivery rate. Neither party contends that DSPs have any control over either the relationship with the retail client or the end customer (e.g., that they may expand their client or customer base or perform additional

---

[2] There is a dispute as to whether the worker's compensation requirement is enforced.
[3] It appears this refers to reimbursement for costs by RXO.

services). RXO mangers have regular meetings (the exact frequency is disputed) with drivers to communicate client requirements and give them feedback on their performance.

RXO creates routes each day for DSPs, which take a full day to complete. RXO determines which DSPs get which routes, texting them the night before. At certain facilities, DSPs must report at a certain time. When drivers arrive, RXO provides the driver with a manifest showing the delivery stops and associated timeframes, with the driver's ID number on the manifest. RXO does not give routes to drivers with unapproved helpers. RXO requires advance notice if a "secondary" driver will be taking the route. Drivers and helpers are subject to a dress code requiring "professional" attire that is enforced by refusing routes to the offender or requiring them to wear an RXO-issued uniform. RXO managers decide whether drives and helpers are compliant with the dress code.

Deliveries must be made in the time windows listed on the manifest, drivers must call customers thirty minutes ahead of time or if they will be late, and drivers must call RXO if the customer is not home. At least at some facilities, RXO provides detailed instructions for drivers to follow in the event a customer is not home. There is a dispute as to whether minor changes in the schedule are acceptable. While making deliveries, drivers log each delivery in a smartphone application, are required to notify RXO if a customer was not home, and are monitored by RXO, which is in constant communication with the drivers. As discussed above, RXO's clients provided requirements and instructions to DSPs regarding delivery and installation of equipment and rules regarding contacting customers. Client expectations were enforced by moving drivers and helpers to different clients if they did not meet expectations, but there is a genuine dispute if individual jobs were withheld. Drivers are expected to finish all the deliveries on the day given. "Co-loading" products was not allowed.

services). RXO mangers have regular meetings (the exact frequency is disputed) with drivers to communicate client requirements and give them feedback on their performance.

RXO creates routes each day for DSPs, which take a full day to complete. RXO determines which DSPs get which routes, texting them the night before. At certain facilities, DSPs must report at a certain time. When drivers arrive, RXO provides the driver with a manifest showing the delivery stops and associated timeframes, with the driver's ID number on the manifest. RXO does not give routes to drivers with unapproved helpers. RXO requires advance notice if a "secondary" driver will be taking the route. Drivers and helpers are subject to a dress code requiring "professional" attire that is enforced by refusing routes to the offender or requiring them to wear an RXO-issued uniform. RXO managers decide whether drives and helpers are compliant with the dress code.

Deliveries must be made in the time windows listed on the manifest, drivers must call customers thirty minutes ahead of time or if they will be late, and drivers must call RXO if the customer is not home. At least at some facilities, RXO provides detailed instructions for drivers to follow in the event a customer is not home. There is a dispute as to whether minor changes in the schedule are acceptable. While making deliveries, drivers log each delivery in a smartphone application, are required to notify RXO if a customer was not home, and are monitored by RXO, which is in constant communication with the drivers. As discussed above, RXO's clients provided requirements and instructions to DSPs regarding delivery and installation of equipment and rules regarding contacting customers. Client expectations were enforced by moving drivers and helpers to different clients if they did not meet expectations, but there is a genuine dispute if individual jobs were withheld. Drivers are expected to finish all the deliveries on the day given. "Co-loading" products was not allowed.

RXO tracks and publicly maintains records of DSPs' performance that it keeps on screens or bulletin boards in its warehouses. These rankings are used to determine if DSPs received more work. In rare cases customer complaints result in the end of the relationship between RXO and the DSP.

2. 148B

148B creates a three-prong "ABC" test to determine whether an employer may rebut the presumption that those who provide it services are its employees:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and (2) the service is performed outside the usual course of the business of the employer; and, (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

*Patel*, 489 Mass. at 360, 183 N.E.3d at 404. "If any one of these criteria is not shown, the statute directs that the individual is an employee for purposes of our wage statutes and entitled to the protections set forth therein." *Id.* at 360-61, 404-05.

a. Prong A: Free From Control

Whether a worker is free from control "turns on whether the worker's activities and duties [were] actually . . . carried out with minimal instruction." *Sebago*, 417 Mass. at 332, 28 N.E.3d at 1149 (citation omitted). This prong "contains a conjunctive test under which the plaintiffs need only prevail on one branch." *DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 400 (D. Mass. 2019). The employees must be free from control both as a matter of contract and as a matter of fact. If the employer in fact exerted control over the employees, it does not matter whether they had a contractual right to do so. *Sebago*, 471 Mass. At 332, 28 N.E.3d at 1149 (citations omitted). This Court finds the DSA ambiguous and therefore its interpretation raises issues of fact appropriate for a jury to decide. *Farmers Ins. Exch. v. RNK,*

10

*Inc.*, 632 F.3d 777, 783-84 (1st Cir. 2011); *see also DaSilva v. Border Transfer of MA, Inc.*, 377 F. Supp. 3d 74, 95 (D. Mass. 2019) (making a similar holding regarding a similar contract).[4] However, this Court finds that as a matter of fact, RXO has failed to carry its burden to show that plaintiffs were free from its control.

### i. Legal Standard

Relevant, though not exhaustive, indicia of control include choice of transport, expansion of customer base without prior approval, and control over contractors' employees. *Athol Daily News v. Bd. Of Review of Div. of Emp't and Training*, 439 Mass. 171, 177-78, 786 N.E.2d 365, 371 (2003). Similarly, "an independent contractor completes the job using his or her own approach with little direction and dictates the hours that he or she will work on the job." *Sebago*, 417 Mass. at 332, 29 N.E.3d at 1149. Control over the suggested price,[5] customers' complaints being routed to the employer, the existence of a manager, and at-will termination are not relevant to control. *Id.* at 439 Mass. at 178, 786 N.E.2d at 371.

Defendant argues that the proper analysis of control should be "the safe and efficient transportation, delivery, and set up of consumer products." Thus, defendant argues time windows cannot be indicia of control because timely delivery is a parameter of the job contracted to do, not the manner of doing the job. There is non-binding authority holding that an intermediary, like

---

[4] For instance, Section 4.2 of the DSA reads that "no officer, agent or employee of [RXO] shall have the authority to prescribe hours of work, what route the Contract Carrier is to follow, or other details of service. [RXO] will not specify or require that a minimum number of hours or a minimum volume of pickups and deliveries be maintained." The DSA continues, "If [RXO] or its customer(s) should at any time indicate in any manner its policies or procedures with regard to the specific means by which Contract Carrier shall perform its obligations under this Agreement, such communications shall be construed to be advisory only." But Section 11 gives RXO the right to terminate the contract if it believes the DSP is not performing adequately. Thus, the DSA simultaneously promises (1) the DSP is not controlled by RXO (2) if control is exerted, it is "advisory," and (3) RXO retains the ability to fire DSPs if it does not believe the DSP performed to RXO's satisfaction.

[5] Defendant argues control over the price is not an indicium of control, but *Athol* only held that an intermediary setting the *suggested* price was not an indicium of control.

11

RXO, does not control a contractor by "coordinating" with the third-party client, like Lowes or Ikea. *See, e.g.*, *Tiger Home*, 101 Mass. App. Ct. at 378-79, 193 N.E. 3d at 466-67; *cf. Jinks v. Credico (USA) LLC*, 488 Mass. 691, 705-706, 177 N.E. 3d 509, 522-23 (2021) (in conducting the "joint employer" test—distinct from the "control" test—holding that "quality control measures," requirements to ensure proper training, monitoring, and maintaining background checks and drug tests "does not constitute supervising and controlling work conditions.").

In *Tiger Home* the intermediary was brokering discrete jobs (home inspections) with discrete third-party clients (homeowners). Here, the intermediary's contract with the client and the intermediary's contract with the DSP are both long-term, and the DSPs are "dedicated" to a particular client. When the job is discrete, relatively strict job "parameters" make sense and coordination is not evidence of control. However, when the relationship is continuous, that interpretation of 148B would allow employers to bypass the control prong by simply offloading the particularity to the intermediary-client contract—which is what happened here. Taken to its logical conclusion, intermediaries could simply "coordinate" every aspect of a job with the third-party client or define the "parameters" of the job in exact detail, then classify their employees as independent contractors. That is inconsistent with the Supreme Judicial Court holding that 148B is to be interpreted and applied liberally, *Patel*, 489 Mass. At 359-60, 183 N.E. 3d at 403-04, and limitations on its scope should not be implied, *id.* at 363, 406. Therefore, this Court rejects RXO's proposed job description insofar as it attempts to exclude specific "safety" and "efficiency" controls from the control analysis.

This Court also rejects the defendant's attempt to reframe control as "coordination." In fact, as this Court held in the class certification order, "the fact that [RXO] required all drivers to abide by [RXO's] client's expectations—even though those expectations varied from client to

client—is a fact common to the class and relevant to the issue of liability." (Docket No. 147, at 8). Even though the evidence shows that there may have been disparate client expectations, the fact that RXO enforced these disparate expectations is evidence of control.

Similarly, RXO argues there is a genuine dispute as to control because plaintiffs only offer evidence relating to some of RXO's clients. However, RXO is the party with the burden of proof—*it* must provide specific evidence to create a genuine dispute of material fact. It cannot refuse to introduce contracts it has control over or information about workplaces it has knowledge of and argue the resulting ambiguity creates a genuine dispute of material fact. *Cf. Griggs-Ryan*, 904 F.2d at 115 (promises of undisclosed evidence do not defeat summary judgment).

### ii.   Application

DSPs own their truck, can park and maintain it where they choose, and use their own tools. They train, choose, and determine the pay of their employees. Generally, RXO's managers do not personally oversee the process of loading or delivering goods. DSPs may be able to make minor deviations in their scheduled routes. However, the remaining undisputed evidence is favorable to the plaintiffs. Before hiring a DSP, an RXO manager will meet with them, go through either a physical or verbal checklist and provide them with a pre-qualification packet. That packet instructs them to obtain a photo ID, among other things.

All DSPs must maintain the type and amount of insurance mandated by RXO. DSPs cannot use unapproved helpers and all employees must comply with RXO's background check requirements. DSPs must inform RXO who is driving the truck in advance. Managers regularly meet with DSPs to give them feedback and communicate client expectations. RXO points out that the existence of managers is not an indicator of control. *Athol*, 439 Mass. at 178, 786 N.E.2d

at 371. However, regular meetings where the manager provides particularized feedback based on the contractor's performance are.

DSPs receive a daily manifest from RXO detailing their route with time windows for making deliveries. Although the precise time and strictness varies by facility, DSPs are generally required to get to the loading dock by a certain time every morning. Drivers must meet the time windows in their daily manifest and log each delivery in an app that RXO uses to monitor the driver's progress. Drivers are expected to call thirty minutes ahead of delivery and anyone entering a house is required to wear an RXO-issued badge with an RXO symbol along with the driver's or helper's name.

While making deliveries, DSPs are subject to a dress code which is enforced by a choice of giving up work or wearing an RXO-issued uniform. DSPs receive communications containing specific expectations as to how to make deliveries and must abide by those expectations or risk reassignment. Consider the bulletin for DSPs dedicated to IKEA:

> The process for Not at homes is as follows: Always call every customer 30 minutes prior to arrival; once arrived on site, and customer is not home, and you've knocked on the door, take a picture of the door with the number in the subject line. Then call the office at LastMileStoughton@XPO.com along with the order number in the subject line. Then call the office and inform us that you have a Not at home. At this point, we will put you on hold (do not hang up) and we will return with a case number. Do not leave the premise until the IKEA not at home process is complete. Once we give you a case number, you may depart.

(Docket No. 164-32, at 1). Contrary to RXO's arguments, it is not the plaintiff's burden to introduce evidence as to every possible class member. With this and similar evidence the plaintiffs have met their initial burden of showing there is no genuine dispute of material fact and the defendant has the burden of presenting trial-worthy evidence to show such a dispute exists. It has not.

Furthermore, DSPs are expected to provide delivery services seven-days a week, even if there is a dispute as to exact consequences of rejecting a route. "Co-loading" freight from non-clients is not allowed. Customers rate the delivery service and RXO tracks and publicly displays those ratings in its warehouses, though not at the facilities controlled by clients (most goods were delivered out of RXO warehouses, but at least at Lowes goods are delivered out of Lowes facilities). Drivers with high ratings are given their choice of route and customer complaints can lead to RXO terminating a relationship with a DSP. RXO points out that having customer complaints routed through the intermediary is not an indicator of control. *Athol*, 439 Mass. at 178, 786 N.E.2d at 371. However, an intermediary using that customer feedback to direct a DSP's performance is.

Drawing all reasonable inferences in its favor, the defendant has not presented sufficient evidence to create a genuine issue for trial. Indeed, although the defendant relies heavily on *Athol*, the contrast between the facts of that case and this one is instructive:

> Carrier[s] may deliver on foot, by bicycle, automobile, motorcycle, or otherwise. They are free to adopt any manner of dress or wrap the newspapers in any way. They may agree to perform services for their customers other than the delivery of newspapers and to charge separately for these services. Without approval from the News, they may expand the number of customers on their routes or be assisted by anyone in the delivery of the newspapers. In fact, once carriers receive their newspapers from the News, they are entirely free from its supervision in performing the services for which they were engaged.

*Id.* at 178, 371. Here, though there is some dispute about the exact requirements, plaintiffs must drive box trucks. They are circumscribed in how they deliver the products. They are subject to a dress code. They have no control over their customer base. Helpers are prescreened. They are monitored by RXO before, during, and after deliveries. Indeed, the only aspects of their work DSPs had control over were the aspects that a typical employer would like to relinquish: paying and training additional employees and maintaining tools and equipment. Under Chapter 148B,

RXO cannot relinquish "control" over these costs, retain control over all other aspects of employment, and receive the unfair "windfall" that results from "avoid[ing] their statutory obligations, shift[ing] financial burdens to state and federal governments, and [gaining] an unfair advantage in the marketplace." *Patel*, 489 Mass. at 359-60, 183 N.E. 3d at 403-04.

### B.  Prongs B and C

This Court need not address prongs B and C because plaintiffs only need to prevail on one prong to establish they are employees. *Patel*, 489 Mass. at 360-61, 183 N.E.3d at 404-05. However, this Court notes that the First Circuit has held Prong B is preempted by federal law, *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 435-40 (1st Cir. 2016), and that the genuine dispute as to whether drivers are punished for not taking routes likely precludes summary judgment for the plaintiffs on Prong C, *DaSilva*, 377 F. Supp. 3d at 97 (finding that genuine disputes about co-loading and whether drivers were punished for rejecting routes precluded summary judgment on this prong).

### Conclusion

For the reasons above, the Court ***grants*** plaintiffs' motion for partial summary judgment.

**SO ORDERED**

                                              */s/ Timothy S. Hillman*
                                              **TIMOTHY S. HILLMAN**
                                              **DISTRICT JUDGE**