UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUSTIN MUNIZ, MOHAMMED BELAABD, NELSON QUINTANILLA, JOSE DILONE, and VICTOR AMARO, on behalf of themselves and all others similarly situated,<br><br>             Plaintiffs,<br><br>             v.<br><br>RXO LAST MILE, INC.,<br><br>             Defendant. | CIVIL ACTION<br>NO. 4:18-11905-TSH |

**ORDER AND MEMORANDUM ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 205)**

**December 21, 2023**

**HILLMAN, S.D.J.**

      Plaintiffs Justin Muniz, Mohammed Belaabd, Jose Dilone, and Victor Amora bring this action on behalf of a certified class against defendant RXO Last Mile, Inc. ("RXO"). The Plaintiffs are employees of RXO, a federally authorized freight forwarder, who deliver appliances and other large consumers goods for RXO's retail clients. The Plaintiffs allege that RXO unlawfully deducted wages from their pay in violation of the Massachusetts Wage Act. M.G.L. c. 149, §§ 148 and 150. RXO moves for summary judgment. For the reasons below, the Court ***denies*** RXO's motion.[1]

---

[1] In some portions of its statement of material facts, RXO attempts to relitigate this Court's prior order finding that the Delivery Service Providers ("DSP") in the certified class were employees for the purposes of the Massachusetts Wage Act. (Docket No. 202). Those statements are not material to the instant motion and are therefore not considered.

1

## Background

RXO arranges and facilitates deliveries of large goods on behalf of retailers to the purchasing customer. RXO contracts with DSPs to complete these deliveries. The contractual relationship between RXO and the DSPs is reflected in a standardized Delivery Service Agreement ("DSA"), at least insofar as the DSA refers to the payments and deductions at issue here.[2] The DSAs are paid per-delivery, per-stop or a daily flat rate. Although the Plaintiffs dispute whether a flat rate was available, it is not material to this motion. RXO alleges that "[h]ow DSPs earn gross revenue and what expenses are deducted from that gross revenue is spelled out in the Delivery Service Agreement." However, RXO concedes that it paid DSPs a *set amount*, regardless of whether that payment was per-stop, per-delivery or a daily flat rate). Thus, the characterization that DSPs earned "gross revenue" is true in the sense that virtually all employee earnings are derived from "gross revenue," but the DSA does not use gross revenue as a starting point in calculating pay. The rate[3] is set out in a "Schedule A" appended to each DSA.

In their complaint, Plaintiffs allege that "deducting certain expenses from its workers' pay, including for damage claims, uniforms, and insurance are unlawful under the Massachusetts Wage Law, M.G.L. c.149, §148, and c. 149, §150." (Docket No. 43, at ¶ 25). The DSA includes a provision for "Loss or Damage to Product." Under this provision, the DSP is "fully liable for the loss, theft, or destruction of or any damage to merchandise in its custody or control in the delivery process" and RXO has "the right to offset such damages from the DSP's reconciliation

---

[2] This Court previously found that it was ambiguous whether the DSA created an employer-employee relationship under Massachusetts law. (Docket No. 202). Thus, that the contract purports to create an independent contractor relationship is immaterial to this motion. The Plaintiffs dispute whether the DSPs could negotiate their wages, but RXO concedes the DSP is "standardized." Therefore, there is no material dispute.

[3] The Plaintiffs appear to object to the use of the term "revenue structure" instead of "rate" by RXO. Although this Court finds rate a more accurate description, it is not clear this is a distinction with a difference.

for services performed under this Agreement, provided such amounts are reasonably substantiated." There is a similar provision for "Damage to Property" that provides for an escrow fund to pay for damages or loss claims. The DSA provides that "[p]ayment shall be made pursuant to any Schedule A(s) attached hereto and made part of this Agreement," and that RXO shall engage in a weekly reconciliation process to "reconcile the amount of Payments due to the DSP for services rendered under this Agreement with any offsets for claims or losses resulting from the DSP's services under this Agreement as set forth in Sections, 6, 7 and 8 above" (relating to loss or damage to products or property). Following reconciliation, RXO transfers the remaining sum of money to a third-party settlement administrator that submits the payment to the DSPs.

RXO also requires that the DSP assume certain expenses, including "all expenses associated with the employment of such persons [whom it hires as employees], including, without limitation, wages, salaries, employment taxes, workers' compensation coverage, health care, retirement benefits and insurance coverages," and "insurance of the kinds and amounts specified in" Schedule D to the agreement. Schedule D requires "specific insurance coverage requirements for motor truck and cargo liability, general liability and personal injury liability, excess liability, and workers' compensation."

## Standard of Review

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party. *Morris v. Gov't Dev. Bank of P.R.*, 27 F.3d 746, 748 (1st Cir. 1994). A fact is "material" when it may affect the outcome of the suit. *Id*. When ruling

on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Analysis

### 1. Timeliness and Sanctions

The Plaintiffs argue that this motion is untimely. Under Rule 56(b), unless a different time is given by the Court or local rules (neither applicable here), a party has thirty days after the close of discovery to file motions for summary judgment. This Court set a schedule for class discovery. (Docket No. 90). It is clear from the parties' joint submission at the beginning of this case that they envisioned discovery to continue in some form after class certification. (Docket No. 62, at 2). Although discovery has largely closed between the parties, the Court has recently resolved post-certification disputes. *See, e.g.*, (Docket No. 183). Under these circumstances, the Court will not find that Rule 56(b) has been violated. Plaintiffs also argue that this is an "11th hour" filing. There was no operative schedule after class certification was granted and there continues to be none. A status conference was set for September 29, 2023, (Docket No. 203), but on September 27, 2023, RXO filed this motion and the parties agreed to postpone the conference. While RXO filed this motion two days before a status conference clearly intended to determine the schedule for the remainder of the case, it did not file it on the eve of trial, or before a comparable deadline. Furthermore, RXO's motion relies heavily on a recent decision from the District of Connecticut between RXO and plaintiffs bringing similar claims, represented by the same counsel representing these plaintiffs. *See generally Green v. RXO Last Mile, Inc.*, No. 3:19-cv-1896-JAM, 2023 WL 5486250 (D. Conn. August 24, 2023). While this Court finds the application of Connecticut law in *Green* unpersuasive in this Massachusetts matter, the decision

4

is relevant. That opinion was released on August 24, 2023. RXO filed this motion a little over a month after. Thus, rather than disrupting the scheduling conference, RXO was bringing relevant case law to this Court's attention.

For similar reasons, this Court will not sanction RXO under Rule 11(b) for making frivolous legal arguments. Its briefing attempts to connect *Green* with this matter by pointing out that a case the Court in *Green* heavily relied upon was recently favorably cited by the Supreme Judicial Court of Massachusetts ("SJC"). It attempts to distinguish cases that undermine its position and emphasizes those that support it. That is what lawyers do. Furthermore, though this Court finds Judge Woodlock's opinion in *Martins v. 3PD, Inc.* persuasive, No. 11-cv-11313-DPW, 2014 WL 1271761 (D. Mass. Mar. 27, 2014), *Martins* is not "good law" as the Plaintiffs claim. It has *no* precedential effect. *Vertex Sugrical, Inc. v. Paradigm Biodevices, Inc.*, 648 F. Supp. 2d 226, 231-36 (D. Mass. 2009) (Woodlock, J.) (discussing at length the purposes and persuasive value of trial court opinions). Its persuasive value comes from its application of binding law. That said, this Court does admonish RXO for failing to cite *Camara v. Attorney General*, 458 Mass. 756 (2011), in its initial memorandum (though it does address it in its reply). That case is both binding and far more relevant than the Connecticut and Second Circuit precedent RXO cites extensively. Similarly, RXO cites heavily to cases analyzing when commissions become wages for the purposes of the Wage Act, which is not applicable to this dispute, and RXO fails to even acknowledge the distinction or explain why the case law concerning commissions should be applied to non-commission wages. RXO is a sophisticated litigant and this Court doubts these omissions were unintentional. That said, the standard for Rule 11 sanctions is high and the Court declines to institute them.

2. The Merits

In Massachusetts, "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned." M.G.L. c. 149, § 148. Furthermore, "[n]o person shall by a special contract with an employee or by any other means exempt himself from this section or from section one hundred and fifty." As discussed below, the SJC has interpreted these provisions to prohibit various types of deductions from wages. RXO argues that, rather than being unlawful deductions *from* wages, its deductions were part of the formula for determining wages. This is foreclosed by Massachusetts precedent and that precedent was not abrogated in *Patel v. 7-Eleven*, 489 Mass. 356 (2022). In Massachusetts, a company may not avoid the obligations of wage laws by including violations of those laws in its employment contracts.

        a.   Connecticut Law

In Connecticut, the wage law largely functions as a statutory cause of action for certain breaches of contract. As such, when an employer fulfills their side of the bargain there is rarely a violation, regardless of the substance of the agreement. For instance, *Green* concluded that because "the Agreement itself explicitly lays out the process by which revenue earned under Schedule A is reconciled with the value of lost or damaged goods before being paid out to the carriers," the deductions are properly part of the "wage calculation." 2023 WL 5486250, at *5. Similarly, in *Mujo v. Jani-King International, Inc.*, "accounting fees, royalty fees, advertising fees, and insurance fees" could be deducted from the payments received by franchisees under Connecticut law because the "franchise agreement expressly provides for the deductions" and "the public policy of freedom of contract therefore require enforcement of the parties' agreement." 13 F.4th 204, 208, 211 (2d Cir. 2021) (citation omitted). And in *Mytych v. May*

6

*Department Stores Co.*, the Connecticut Supreme Court found that deducting customer returns from revenues in calculating commissions did not violate the wage act because what the "wage" was determined by contract, not by law. 260 Conn. 152, 166 (2002).[4] The Connecticut Supreme Court later clarified that where "an employee has agreed to a specific formula for the calculation of wages the part of the formula that allows deductions does not constitute a deduction from earned wages." *Ziotas v. Reardon Law Firm, P.C.*, 296 Conn. 579, 592 (2010). Whatever the merits of Connecticut's approach, it is not Massachusetts'.

                b.   Massachusetts Law – Deductions

In Massachusetts, it is not enough that the parties have a clear agreement about how wages are calculated. As the Plaintiffs argue, the Wage Act bans "special contract[s] . . . or any other means" employers may use to circumvent the requirement that employees are paid the wages they earn. M.G.L. c. 149, § 148; *contra* Conn. Gen. Stat. § 31-73 (similar statute contains no "special contract" or "any other means" language). When a contract authorizes deductions from wages "only to certain employees and only in certain circumstances," it is a "special contract" and violates the wage laws. *Camara*, 458 Mass. at 762. The quintessential violation of this doctrine occurs when employers deduct damages caused by employees from their pay. *Id.* at 762-63. RXO concedes it deducted damages caused by its employees from their pay. Courts in this District have found substantively identical deduction schemes to violate the Wage Act, applying *Camara*. *See, e.g.*, *DaSilva v. Border Transfer of MA, Inc.*, 377 F. Supp. 3d 74, 88–89 (D. Mass. 2019); *Martins v. 3PD Inc.*, No. 11-cv-11313-DPW, 2014 WL 1271761, at *7 (D. Mass. Mar. 27, 2014). In its reply, RXO attempts to cabin *Camara* to its exact facts. Insofar as it does so on the theory that the SJC adopted Connecticut's approach in *Patel*, that reading is

---

[4] Given the distinction between commissions and other wages discussed below, such a policy might also be lawful in Massachusetts.

7

incorrect for the reasons discussed below. RXO also argues that the contract in *Camara* violated the Wage Act because the *contract* was "ad hoc," rather than the effects. That is not true. The policy in *Camara* applied to all employees. 458 Mass. at 756-57. RXO also argues the policy in *Camara* violated the Wage Act because it was separate from the employment contract. *Camara* makes no such distinction and it is telling that RXO can point to no *Massachusetts* decision interpreting *Camara* in that manner. *See also Awuah v. Coverall N. America*, 460 Mass. 484, 488-89 (Mass. 2011) (discussing a single contract that included unlawful deductions). This Court will not limit *Camara* to its facts.

Furthermore, under M.G.L. c. 149, § 150 an employer may raise a "valid setoff" affirmative defense. It does not seem that RXO sufficiently raised this issue in its briefs. Regardless, such a defense fails because RXO concedes it assigned fault to its DSPs whenever damages to products occurred so long as they were "substantiated." That cannot be reconciled with the rule in *Camara* that:

> An arrangement whereby [the employer] serves as the sole arbiter, making a unilateral assessment of liability as well as amount of damages with no role for an independent decision maker, much less a court, and, apparently, not even an opportunity for an employee to challenge the result within the company, does not amount to "a clear and established debt owed to the employer by the employee."

458 Mass. at 763 (citation omitted). In a perverse sense, always assigning fault to the employee is "clear," but fails to "establish" the debt within the meaning of *Camara*: the debt must be proven through some kind of neutral process. Furthermore, RXO's interpretation of the Wage Act would make the "valid setoff" defense a nullity: no employer would bother to meet the exacting standards for a valid setoff laid out in *Camara* when they could avoid them by simply including the deductions in the initial contract. RXO has failed to show its deductions are lawful.

    c.   *Massachusetts Law – Insurance*

RXO never addresses the issue of insurance in depth, but it seems to argue that requiring its employees to carry insurance, including workmen's compensation insurance, is also part of the "wage" they agreed to because the requirement to hold insurance is in the DSA. As the Plaintiffs point out, this also runs headlong into binding case law. In Massachusetts, employers may not require their employees to pay for workmen's compensation or "liability-focused insurance costs," absent a valid set-off defense, even by contract. *Awuah*, 460 Mass. at 494-97. This is true even if the employee is forced to buy the insurance, rather than having the cost of insurance deducted from their paycheck. *Id.* at 497 n. 22. Although it cites *Awuah*, RXO never addresses that aspect of *Awuah*, nor the non-binding but persuasive precedent from this district involving nearly identical schemes. *See, e.g.*, *DaSilva*, 377 F.Supp.3d at 88-89; *Martins 3PD Inc.*, 2014 WL 1271761, at * 7-*8. Thus, RXO has failed to show its compulsory insurance scheme is lawful.

### d. Patel and Green

RXO's argues that after *Patel*, employers in Massachusetts may now, by contract, do what was forbidden in *Awuah* and *Camara*. This argument fails, though a careful dissection of the relevant passage in *Patel* is required to parse out its effects.[5]

The passage is a response to Defendant 7-Eleven's "contention that . . . every franchisee [is] an employee for purposes of the Massachusetts wage statutes, and because such a finding precludes charging a franchise fee pursuant to [the] decision in [*Awuah*]. . . the entire franchise model in the Commonwealth is in jeopardy." *Patel*, 489 Mass. at 370 (citing *Awuah*, 460 Mass.

---

[5] The Plaintiffs correctly point out the passage from *Patel* is dicta. While technically true, the passage is intended to prevent an unduly broad reading of its primary holding that franchisees can be employees in Massachusetts for the purposes of the Wage Act. *Patel*, 489 Mass. at 368-69. As discussed below, while the Court will not interpret this passage broadly, it cannot simply ignore it. That said, the Plaintiffs are broadly correct that the cited passage in *Patel* does not reach this case.

at 498). The SJC dismisses out of hand 7-Eleven's first premise that every franchisee is necessarily an employee. Then, in the crucial passage for this motion, it dismisses the second premise, holding that "where appropriate, a franchise fee [can] be assessed as a cost of doing business deductible from gross revenue rather than from wages." *Id.* at 370-71. The SJC then approvingly cites *Mujo*'s holding that "the deducted franchise fees are not wages under the Connecticut minimum wage statute." *Id.* at 371 (citing *Mujo*, 13 F.4th at 212). Finally, it cites a footnote from *Awuah* discussing the calculation of damages where an employment contract uses gross revenues as its starting point for calculating payments for employees.

The import of the passage is unclear, in part because what the SJC is referring to as "franchise fees" is ambiguous. The first citation to *Awuah* in the passage from *Patel* above is to a holding in *Awuah* concerning fees paid by franchisees for the privilege of doing business with the franchisor. For clarity's sake, this Court will refer to fees that are charged *only* for the privilege of doing business as "Franchise Fees." After *Awuah*, charging employees Franchise Fees is unlawful in Massachusetts and provisions in contracts that include them are void for public policy. 460 Mass. at 497-99. However, the citation to *Mujo* in *Patel* misquotes that opinion by replacing the phrase "deducted fees" in the original *Mujo* opinion with "franchise fees." The portion of *Mujo* the SJC cites discussed "accounting fees, royalty fees, advertising fees, and insurance fees," *not* Franchise Fees. 13 F.4th at 208.[6] In *Mujo*, the Second Circuit held

---

[6] *Mujo* did discuss Franchise Fees in a different section of the opinion. Somewhat distinct from RXO's argument here, the Second Circuit relied on the questionable syllogism that because (1) franchise agreements are lawful, (2) franchisees can be employees and (3) there is freedom to contract, the initial fees do not violate the statutory command that "no employer . . . shall, directly or indirectly, demand, request, receive or exact any . . . fee . . . in order to obtain employment or continue in employment." Conn. Gen Stat. § 31-73. This reasoning, aside from being unpersuasive, is inapplicable to this case not only because it is an interpretation of a different state's laws and not only because it is not referenced in *Patel*, but because it is limited to franchisee-franchisor relationships. However, it is also flatly inconsistent with *Awuah* and therefore is further evidence that RXO's theory that *Patel* adopted *Mujo* wholesale is badly flawed.

10

accounting, royalty and advertising fees could be withheld from gross revenues without violating Connecticut's wage laws. Some of those deductions, such as insurance fees, would violate Massachusetts law under *Awuah*. 460 Mass. at 496-97. However, others might not.

The opinion in *Patel* then goes on to cite a footnote from *Awuah*. 460 Mass. at 491 n. 20. This footnote does not address Franchise Fees. Instead, it discusses how to avoid giving a windfall to either party when the calculation of payments to franchisees uses gross revenue as a starting point. On the one hand, the Wage Act does not allow employers who misclassify employees off the hook by claiming they would have paid them less had they known they were employees. *Id.* On the other, the contractual calculation of payment for would-be independent contractors often references gross revenue, rather than the cost of labor. *Id.* For instance, in *Awuah* the contract used gross revenues as a starting point for calculating payments to franchisees, subject to a variety of deductions, including some that the plaintiff in *Awuah* never claimed were unlawful. *Id.* at 488. As such, plaintiffs bringing Wage Act claims may not claim damages as the difference between gross revenue and the payment received, but neither may an employer argue that *all* the deductions from gross revenue would have been internalized had they hired the plaintiff as an employee. *Id.* at 491 n. 20 (noting that "billing service costs" would be the type of "customer-related management costs" that are separate from the cost of labor). The SJC has not provided further guidance on how to determine which types of deductions are violations of the Wage Act, but it has never adopted RXO's position.

It is conceivable that some of the deductions in *Mujo* would be allowable in Massachusetts under *Awuah* insofar as they were legitimate "management costs" and not labor costs the employer was shifting to its employees. In that sense, the citation to *Mujo* does not represent a change in Massachusetts law. However, the SJC specifically changed the language in

11

its citation to *Mujo* to reference "franchise fees." And the SJC in *Awuah* emphatically held that Franchise Fees—as this Court understands the term—are barred even when they are contained in a bargained-for agreement if they are extracted from employees. 460 Mass. at 498-99. Compounding the ambiguity, in *Patel* the discussion of the 7-Eleven franchise agreements does not distinguish between Franchise Fees and other deductions. 489 Mass. at 358 (referring to "various fees required by the franchise agreement to 7-Eleven for the privilege doing business with it."). That conflates the distinction between deductions for management costs and other deductions in *Awuah*. The question, therefore, is how broadly to read the passage from *Patel* given these ambiguities.

RXO argues that the citation to *Mujo* represents a wholesale acceptance of the Second Circuit's approach: if the deductions are a bargained-for part of the wage calculation they are lawful. However, "[w]here, as here, a federal court sits in diversity jurisdiction, tasked with following state law, it is not free to innovate but, rather, must apply state substantive rules of decision as those rules have been articulated by the state's highest tribunal." *President & Fellows of Harvard Coll. v. Zurich Am. Ins. Co.*, 77 F.4th 33, 35 (1st Cir. 2023). This Court cannot accept that the SJC in *Patel* completely reworked its understanding of the Wage Act in a clarifying paragraph, in dicta.

As such, the more appropriate and natural reading of the passage from *Patel* is far narrower: Franchise Fees might be, "*where appropriate*," a management cost rather than an unlawful deduction from the cost of labor, and therefore not proper damages for franchisees who are misclassified as independent contractors. 489 Mass. at 370 (emphasis added). Despite the confused citations in *Patel*, the best way to make sense of the passage is to limit it to this Court's understanding of Franchise Fees: fees charged only for the privilege of doing business.

Introducing other types of deductions introduces case law not cited in the passage—such as *Camara*—and this Court will not interpret the SJC as abrogating or limiting precedent by implication. Furthermore, in *Awuah* the SJC noted the issue of gross revenue only arises when the contract in question uses gross revenues as the starting point for calculating earnings. When "a rate of pay . . . immediately recognizable as compensation for labor" is identifiable in the contract, the issue never arises because deductions from *that* are clearly unlawful. *Awuah*, 460 Mass. at 491 n. 20. Nothing in the passage from *Patel* suggests otherwise, and a contrary reading would fail to explain the references to Footnote 20 or the emphasis on "gross revenue." *Patel* might signal a shift away from the hard-and-fast rule in *Awuah*. But it does not support RXO's reading that *Patel* adopted the logic of *Mujo* wholesale. Because this case neither concerns Franchise Fees nor payment based on gross revenues, this Court need not determine the precise circumstances when a Franchise Fee would constitute a management cost, rather than a labor cost.

Attempting to connect *Patel* to the instant case, RXO argues that Plaintiffs' underlying assumption is that wages are equal to "gross revenues." That is not true. Plaintiffs' argument is that the per-stop, per-delivery or per-day rate are the wages due. Contrary to RXO's arguments in its reply, those rates are "a rate of pay . . . immediately recognizable as compensation for labor." *Awuah*, 460 Mass. at 491 n. 20. RXO has offered no evidence that the rate it set was equivalent to gross revenues.[7] Indeed, while it is not dispositive, the DSA affirms that the rate—*not including the deductions*—is the compensation for the DSPs' labor: "[RXO will] reconcile the amount of Payments due to the DSP *for services rendered under this Agreement* with any offsets for claims or losses resulting from the DSP's services under this Agreement as set forth in

---

[7] If it were, it is unclear how RXO manages to turn a profit, given that it would be paying the entirety of its gross revenues to the DSPs, minus the damages it presumably pays to customers.

Sections, 6, 7 and 8 above." Similarly, RXO barely attempts to justify the required insurance coverages, baldly alleging that because they were included in the contract they were part of the wage calculation. There is nothing in *Patel* that suggests compulsory liability insurance is allowed so long as it is contractually bargained for. Because the reach of *Patel* is far narrower than RXO argues, its reliance on *Green* fails.

In *Green*, the Court adopted RXO's position that because *all* wages are derived from gross revenue, even a rate that does not use gross revenue as a starting point can include deductions, so long as they are part of a single, bargained-for contract. Because that is not the law of Massachusetts, even after *Patel*, that argument fails here. Other alternative holdings from *Green* also fail.

Ironically, given RXO's reliance on *Patel*, that case disposes of Judge Meyer's holding in *Green* that Plaintiffs are trying to have it "both ways" by receiving the benefit of the DSA's wage bargain and damages for deductions. 2023 WL 5486250, at *7. In fact, in Massachusetts, *employers* cannot have it both ways. As the SJC held in *Patel*:

> Employers who misclassify employees as independent contractors enjoy what might be viewed as a windfall. Misclassification permits an employer to avoid its statutory obligations to its workforce. Misclassification further allows employers to shift certain financial burdens to the Commonwealth and the Federal government.

489 Mass. at 359. Such burdens include "[an] unwarranted reprieve from financial contributions to, inter alia, Social Security and Medicare, unemployment insurance, and *workers' compensation*, and from employee income tax withholdings." *Id.* at 359 n. 8 (emphasis added). The SJC has held that the Wage Act is intended to deter unlawful misclassification by employers as much as it is to compensate employees who have been misclassified. *Somers v. Converged Access, Inc.*, 454 Mass. 582, 592-93 (2009) ("The 'windfall' the Legislature appeared most

14

concerned with his the 'windfall' that employers enjoy from the misclassification of employees as independent contractors"). Because the SJC has explicitly rejected this line of reasoning from *Green*, this Court will not adopt it.

Similarly, this Court is, quite frankly, unable to follow the Court in *Green*'s reasoning that:

> [T]he plaintiffs by their course of conduct personally agreed to be paid in accordance with all of the terms of the Agreement including to be subject to the deductions specified in the Agreement. A contrary conclusion would mean that the plaintiffs have no rights at all under the Agreement, including as they claim the rights to be paid as calculated under Schedule A of the Agreement.

2023 WL 5486250, at * 7. At least in Massachusetts, that an employment contract contains unlawful *provisions* does not void the entire contract. That is especially so when what is unlawful about those provisions is their interaction with other, lawful provisions—here, the calculation of wages. Indeed, it is impossible to square the reasoning of *Green* with the holdings in *Camara* and *Awuah*, which held certain provisions in employment contracts were unlawful and clearly contemplated that such holdings would lead to damages, not a void contract. Because *Patel* does not have the reach RXO argues it does, and because *Green*'s holdings are inconsistent with binding Massachusetts law or otherwise unpersuasive, this Court finds that neither decision provides a basis to undermine the application of *Camara* and *Awuah* above.

e. Other Massachusetts Decisions

RXO attempts to make similar arguments by citing non-binding, distinguishable decisions from Massachusetts. First, RXO argues that its employees' wages were not calculated until *after* the reconciliation process, citing to cases involving commissions. Those cases are inapposite because commissions are covered by a separate provision in the Wage Act, as the SJC ruled in *Awuah*. 460 Mass. at 896 n. 19 ("Coverall analogizes its accounts receivable financing to

the payment of commissions, but . . . Coverall does not argue that its workers are actually paid by commission. Special provisions, not applicable here, apply to payment of commissions. *See* § 148, third par.") (citation omitted). Commissions are not wages *at all* until they become "due and payable," and how and when they become due and payable can be altered by contract. *See, e.g.*, *Klauber v. VMWare*, 80 F.4th 1, 13-14 (1st Cir. 2023); *contra Awuah*, 460 Mass. at 492 (Normally, "[w]here an employee has completed the labor, service, or performance required of him . . . he has 'earned' his wage."). RXO never argues that the DSPs wages were "commissions," so these arguments are disregarded.

Second, RXO cites non-binding case law and the general presumption in favor of the freedom to contract, *Rawan v. Continental Casualty Co.*, 483 Mass. 654, 665-66 (2019), for the uncontroversial proposition that there is significant leeway in how wages may be calculated in Massachusetts. For instance, the Wage Act does not require employers to pay employees a constant, per-hour rate, and pay may vary depending on the type of work being done, so long as the formula is "fully explained." *DeSaint v. Delta Air Lines, Inc.*, No. 13-11856-GAO, 2015 WL 1888242, at *33-34 (D. Mass. Apr. 15, 2015). Here, there is no objection to there being a per-delivery rate, such that pay might vary significantly day-to-day. But *DeSaint* did not address deductions or shifting costs to employees. Similarly, while the Court in *Salerno v. Baystate Ford, Inc.*, found that it was not a violation of the Wage Act to only pay workers—in accordance with their contract—for a portion of the work they performed, it did note it would be unlawful to "deduct property damage from paychecks." No. 14-8609-D, 2016 WL 513747, at *4 (Mass. Super. Feb. 5, 2016).

Finally, RXO's reliance on *Somers* is misplaced. The SJC rejected the employer's argument that the employee was receiving a windfall via misclassification because, had the

employee been correctly classified, the rate would have been lower. 454 Mass. at 590-94. The Court here is not recalculating the DSP's wages. Those wages are clearly set out in the DSA. RXO may internalize the costs of insurance and damages by setting a lower overall standard delivery rate, but it may not deduct damages from its employees on an ad hoc basis, at least absent some clear independent review, nor may it require its employees to pay for Workman's Compensation or other types of liability insurance.

## Conclusion

For the reasons above, RXO's motion is *denied*.


**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**SENIOR DISTRICT JUDGE**